UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CAROL THOMAS and GINA ANTONELLI, as the health
care proxies on behalf of patient Sharon Lucy Frederick,

                                                  Plaintiffs,

6:20-cv-01347 (BKS/ML)

v.

MOHAWK VALLEY HEALTH SYSTEM, ST.
ELIZABETH HOSPITAL, and DOES 1 through 10,
inclusive,

                                                  Defendants.
_____

**Appearances:**

*For Plaintiffs:*
Raymond J. Dague
Dague & Martin, P.C.
4874 Onondaga Road
Syracuse, NY 13215

*For Defendants:*
Ryan M. Poplawski
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

On October 30, 2020, Plaintiffs Carol Thomas and Gina Antonelli, in their capacity as health care proxies for Sharon Lucy Frederick, a patient at Defendant St. Elizabeth Hospital, filed a complaint and motion for a Temporary Restraining Order ("TRO"), in which they seek an order enjoining Defendants from removing ventilation from Ms. Frederick, requiring Defendants

to provide Ms. Frederick with a tracheostomy for proper ventilation and a gastric tube for nutrition, and requiring Defendant St. Elizabeth Hospital to continue to provide cardiopulmonary support, medications, nutrition and hydration to Ms. Frederick, at least until she can be transferred to another health care facility. (Dkt. Nos. 1, 2). Plaintiffs assert claims under the First, Fourth and Fourteenth Amendments of the United States Constitution; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"); and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"). (Dkt. No. 1, at 10-19). For the reasons that follow, Plaintiffs' motion for a TRO is denied.

## II.    BACKGROUND[1]

On September 17, 2020, Ms. Frederick suffered a severe stroke that caused her to become mentally and physically incapacitated, and was admitted to St. Elizabeth Hospital[2] ("St. Elizabeth") as a patient. (Dkt. No. 1, at 4). Since her admission to St. Elizabeth, Ms. Frederick has been incapacitated and unable to communicate her wishes for medical treatment. (*Id.*). Her wishes with respect to her medical care were set forth in her Advanced Written Directive, in which she named Plaintiffs as her health care proxies, expressed her devout Roman Catholic religious beliefs, and stated that she "believe[s] in life support" and that she wished to "follow the moral teachings of the Catholic Church and to receive all the obligatory care that my faith

---

[1] The facts set forth herein are drawn from Plaintiffs' complaint, as well as the exhibits submitted by both parties in connection with Plaintiffs' motion for a TRO. (Dkt. Nos. 1, 2, 7-10).

[2] Plaintiffs' Complaint does not explain the relationship between Defendant Mohawk Valley Health System and Defendant St. Elizabeth Hospital or distinguish between the two named Defendants with respect to the alleged conduct, other than noting that the Mohawk Valley Health System receives state and federal funding that is used to care for patients like Ms. Frederick. (Dkt. No. 1, at 3). The Court takes judicial notice of the fact that Defendant Mohawk Valley Health System is an integrated non-profit healthcare system consisting of several associated "campuses," one of which is Defendant St. Elizabeth Hospital. *See* https://www.mvhealthsystem.org/about; *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F.Supp.3d 156, 167 (noting that, for the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court may take judicial notice of information publicly available on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'")

teaches me we have a duty to accept," but also acknowledged that "death need not be resisted by any and every means" and that she had "the right to refuse medical treatment that is excessively burdensome or would only prolong [her] death and delay [her] being taken to God." (Dkt. No. 7-3, at 1-2). Plaintiffs allege that Ms. Frederick has "time and time again expressed her wishes to Plaintiffs, family, and friends that in the event she was unable to make her own health care decisions, she wanted all possible care to be provided to her to sustain her life." (Dkt. No. 1, at 5).

Plaintiffs allege that, despite Defendants' awareness of Ms. Frederick's wishes to receive "all possible" life-sustaining care, as expressed through her Advanced Written Directive and instructions from Plaintiffs as her health care proxies, they failed to provide Ms. Frederick with basic nutrition from September 17 through September 22. (*Id.*). On September 21, an "apnea test" was performed to evaluate whether Ms. Frederick was "brain dead" as defined in New York law,[3] despite a nurse's observation on September 18 that Ms. Frederick did "not meet criteria for brain death examination post-operatively," and despite the fact that Plaintiffs had "vigorously objected to this procedure" because of Ms. Frederick's religious beliefs and the potential risks the procedure posed to her health. (*Id.* at 5-6; Dkt. No. 9-1, at 237). Plaintiffs allege that, throughout this period, Defendants "failed to keep Plaintiffs informed in a timely manner regarding Sharon's medical condition, failed to return phone calls made by Plaintiffs seeking information, and failed to obtain Plaintiffs' consent to treatment and procedures—and even lied and violated Plaintiffs' and Sharon's express wishes." (Dkt. No. 1, at 6).

---

[3] A New York State Department of Health regulation, 10 N.Y.C.R.R. § 400.16, governs determinations of death. Under § 400.16(a)(2), an individual who has sustained "irreversible cessation of all functions of the entire brain, including the brain stem," is dead. 10 N.Y.C.R.R. § 400.16(a)(2).

Following the apnea test, a representative from St. Elizabeth informed Plaintiffs that Ms. Frederick had been determined to be "brain dead." (*Id.*). On September 23, Plaintiffs met with Dr. Stephan Hudyncia, a member of St. Elizabeth's ethics committee, who informed them that Plaintiff had been officially pronounced dead by hospital doctors. (*Id.*).[4] Between September 23 and October 1, Defendants continued to provide Ms. Frederick with hydration and nutrition, indicated that they would provide Ms. Frederick with a gastric tube and tracheostomy, and expressed willingness to work with Plaintiffs to transfer Ms. Frederick to another facility of Plaintiffs' choosing. (*Id.* at 7). However, on October 1, Defendants' counsel informed Plaintiffs that, if Plaintiffs did not file an Order to Show Cause within 24 hours, Defendants would subject Ms. Frederick to the "NYS Guidelines," which would allow them to cease providing treatment, nutrition, hydration and other care. (*Id.*).

On October 2, Plaintiffs filed a Petition and Order to Show Cause in New York State Supreme Court for the County of Oneida (the "State Court"), in which they asked the Court to declare Ms. Frederick's death certificate null and void, and to require St. Elizabeth to continue to provide treatment and care to her. (Dkt. No. 9-1, at 2-14). On October 9, Oneida County Supreme Court Justice Patrick F. MacRae held an evidentiary hearing on the merits of Plaintiffs' petition. (Dkt. No. 9-1, at 16-275). The State Court considered evidence submitted by the parties, including Ms. Frederick's complete set of medical records, as well as testimony from both Plaintiffs, the doctor who had performed Ms. Frederick's apnea test and determined that she was brain dead, and Ms. Frederick's attending physician at St. Elizabeth. (*Id.*). The State Court

---

[4] Plaintiffs' complaint alleges that, despite repeated requests, Defendants "have never produced a certificate of death specifying a date and time of death." (Dkt. No. 1, at 6-7). However, this is apparently incorrect, as Plaintiffs themselves submitted Ms. Frederick's death certificate, which lists her date and time of death as September 21, 2020 at 6:20 PM, into evidence during the October 9, 2020 evidentiary hearing discussed below. (Dkt. No. 9-1, at 31). Defendants attached Ms. Frederick's death certificate as an exhibit to their briefing on the present motion. (Dkt. No. 9-2, at 42),

4

declined to hear testimony from an expert witness proffered by Plaintiffs, Dr. Paul Byrne, on the issues of whether Ms. Frederick met the criteria for "brain death" and whether Defendants' provision of care to Ms. Frederick was proper, finding that he did not meet the relevant legal standards to be qualified as an expert on those issues. (*Id.* at 148-51). The State Court also declined to consider an affidavit from Plaintiffs' second expert, Dr. Cicero Coimbra, on the grounds that Dr. Coimbra was located in Brazil and could not be subjected to cross-examination, and that the facts set forth in the affidavit were insufficient to qualify him as an expert on the issue of whether Ms. Frederick met the criteria for "brain death" under New York law. (*Id.* at 151-53).[5]

Following the hearing, the State Court denied Plaintiffs' petition. The State Court observed that the language in Ms. Frederick's Advanced Written Directive did not clearly state what her wishes would be in the event that she was determined to be brain dead, and that therefore, even giving full credit to Plaintiffs' testimony regarding this issue,[6] the State Court "wasn't able to reach a specific conclusion as to what [Ms. Frederick's] intentions were." (*Id.* at 234-36). The State Court further found that the medical records and testimony of the doctor who conducted Ms. Frederick's brain certification established that Ms. Frederick "was in a coma, that she had no brain stem functions, and she was unable to respirate on her own, and the combination of those, according to the New York State Guidelines, warrant the determination of brain death, which is what the hospital was required to conclude." (*Id.* at 238). Based on this analysis, the State Court found that, under New York state law, it was "compelled to dismiss

---

[5] Plaintiffs attach affidavits from both Dr. Byrne and Dr. Coimbra to their motion for a TRO. (Dkt. Nos. 2-1, 2-2).
[6] While both Plaintiffs testified as to Ms. Frederick's devout Roman Catholic beliefs and her general wishes to receive all life-sustaining care possible, both acknowledged that they never specifically discussed with her what her wishes would be in the event she was determined to be brain dead. (Dkt. No. 9-1, at 53-54, 90).

[Plaintiffs'] petition," and that the decision about what to do next with respect to Ms. Frederick's care was "a decision to be made by the hospital." (*Id.* at 238-39).

Plaintiffs filed a notice of appeal with the New York Appellate Division, Fourth Department, and sought a discretionary stay pending appeal. On October 13, the Hon. Brian F. DeJoseph issued an Order to Show Cause, temporarily staying enforcement of the State Court's order to allow the parties to fully brief the matter. (Dkt. No. 9-2, at 129). On October 29, after the parties had briefed the issues, the Appellate Division issued an order denying Plaintiffs' motion for a stay pending appeal, and providing that the Order to Show Cause would expire on October 30, 2020 at 4:00 p.m. (*Id.*).

On October 30, before the expiration of the Order to Show Cause at 4:00 p.m., Plaintiffs filed the complaint and motion for a TRO presently before the Court. (Dkt. Nos. 1, 2). Shortly thereafter, the Court convened a teleconference among the parties, in which the Court questioned whether Plaintiffs could show either a likelihood of success or serious questions on the merits of their claims, as required for the entry of a TRO. The Court ordered expedited briefing on Plaintiffs' motion, with briefs from both parties due on November 2 by 10:00 a.m., and Defendants agreed not to withdraw care for Ms. Frederick pending the outcome of that briefing. The parties submitted briefing on November 2 as directed, (Dkt. Nos. 7-10), and the Court heard oral argument that same afternoon. The Court denied the motion for a TRO at that hearing, and indicated that a written decision would follow.

### III. STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cty. Med.*

*Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *Id.* at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

Here, the injunctive relief Plaintiffs seek has both prohibitory and mandatory components. The TRO Plaintiffs request would not only require Defendants to keep Ms. Frederick on her ventilator and maintain her current level of care, but would also require them to take affirmative, status-quo-altering actions such as providing her with a tracheostomy and gastric tube. (Dkt. No. 2-4). However, regardless of which legal standard applies, Plaintiffs' request for a TRO must be denied in its entirety because, as explained below, they have not shown a serious question on the merits—the most permissive possible standard for granting injunctive relief—with respect to any of their claims.

7

## IV.   ANALYSIS

### A.   Serious Questions on the Merits

At the initial teleconference on October 30, the Court expressed its questions about whether Plaintiffs could demonstrate a likelihood of success or serious questions on the merits as to any of their claims, and directed the parties to focus on this issue in their briefing. The Court specifically asked the parties to focus on the questions of whether Defendants were acting under color of state law (for purposes of Plaintiffs' constitutional claims) and whether Defendants' alleged misconduct (and the injunctive relief Plaintiffs sought) fell within the scope of the ADA or the Rehabilitation Act.

In their brief, Defendants argue that Plaintiffs cannot succeed on the merits of their constitutional claims because they have failed to show state action, and that they have also failed to state a viable claim under the ADA and the Rehabilitation Act. (Dkt. No. 9, at 11-13). Defendants also argue that Plaintiffs' claims are barred under the *Rooker-Feldman* doctrine and, alternatively, that the Court should follow the doctrine of *Younger* abstention and refrain from resolving Plaintiffs' claims. (*Id.* at 13-14). In their brief, Plaintiffs raise arguments that Defendants failed to properly accommodate Plaintiffs' religious beliefs as required by New York law, and that Defendants' conduct violated the First and Fourteenth Amendment.[7] (Dkt. No. 7-1). Plaintiffs also submit an affirmation from Dr. Matthew C. Lynch—an expert who did not testify in the State Court proceedings—which analyzes Ms. Frederick's medical records and concludes that Defendants erred in declaring her "brain dead" as defined in New York law. (Dkt. No. 7-2). However, neither in Plaintiffs' briefing nor upon questioning at oral argument did Plaintiffs point

---

[7] Plaintiffs' brief does not address their ADA, Rehabilitation Act or Fourth Amendment claims.

8

to any authority addressing the specific questions raised by the Court, or the foregoing arguments raised by Defendants.[8]

### i. Rooker-Feldman Doctrine

"*Rooker-Feldman* bars the federal courts from exercising jurisdiction over claims 'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 94 (2d Cir. 2015) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The *Rooker-Feldman* doctrine holds that lower federal courts lack "subject matter jurisdiction 'over cases that effectively seek review of judgments of state courts.'" *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002) (quoting *Moccio v. N.Y. State Office of Court Admin.*, 95 F.3d 195, 197 (2d Cir. 1996)). District courts "do not have jurisdiction . . . over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional," and "[r]eview of those decisions may be had only" in the Supreme Court of the United States. *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 486 (1983); *cf.* 28 U.S.C. § 1257.

In *Hoblock v. Albany County Board of Elections*, the Second Circuit outlined the "four requirements for the application of *Rooker-Feldman*": "First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain[] of injuries caused by [a] state-court judgment[.] Third, the plaintiff must invite district court review and rejection of [that] judgment[]. Fourth, the state-court judgment must have been rendered before the district court proceeding

---

[8] At oral argument, Plaintiffs referred the Court to *Hensel v. City of Utica*, No. 15-cv-0374, 2020 WL 1451579, 2020 U.S. Dist. LEXIS 51398 (N.D.N.Y. Mar. 25, 2020). However, the ADA claims at issue in *Hensel* are employment discrimination claims that are inapposite to this case.

9

commenced." 422 F.3d 77, 85 (2d Cir. 2005) (alterations in original) (internal quotation marks omitted). A federal suit is "barred by *Rooker-Feldman* only if it complains of injury from the state-court judgment and seeks review and rejection of that judgment, but not if it raises 'some independent claim.'" *Id.* at 86. "Just presenting in federal court a legal theory not raised in state court, however, cannot insulate a federal plaintiff's suit from *Rooker-Feldman* if the federal suit nonetheless complains of injury from a state-court judgment and seeks to have that state-court judgment reversed." *Id*. "The following formula guides our inquiry: a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it. Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear." *Id.* at 88.

Here, there is at least a question as to whether some of Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine. Many of Plaintiffs' core arguments—including their reliance on affidavits from two experts who were rejected by the State Court, and one that never appeared in State Court—seek to relitigate the issue of whether Defendants were correct to conclude that Ms. Frederick met the criteria for "brain death" under New York law and issue a death certificate, an issue that the State Court already considered and definitively resolved in Defendants' favor. (Dkt. No. 9-1, at 238). For purposes of their federal court complaint, Plaintiffs recast their claims as claims alleging, essentially, that Defendants' application of New York's "determination of death" statute, 10 N.Y.C.R.R. § 400.16, in Ms. Frederick's case infringes on her constitutional rights and violates federal statutes. But to the extent that, in substance, these claims seek reversal of the State Court's judgment that Ms. Frederick's death certificate was properly issued and need

not be revoked (and that, as a result, St. Elizabeth may take whatever action it deems appropriate with respect to Ms. Frederick's care), arguably these claims constitute the type of de facto appeal of the State Court judgment that is barred by *Rooker-Feldman*. *Cf., e.g., McMath v. California*, No. 15-cv-06042, 2016 WL 7188019, at *5, 2016 U.S. Dist. LEXIS 171534, at *13-16 (N.D. Cal. Dec. 12, 2016) (finding that the plaintiffs' request for declaratory relief that patient was never "brain dead" under California law was barred by *Rooker-Feldman* doctrine, but that claims alleging the defendants' failure to withdraw the patient's death certificate based on new evidence that was never before the State Court could proceed); *Fonseca v. Kaiser Permanente Medical Center Roseville*, 222 F. Supp. 3d 850, 859 (E.D. Cal. 2016) (finding that the plaintiff's claims were not barred by *Rooker-Feldman* because they consisted primarily of facial, rather than as-applied, challenges to the constitutionality of California's brain death statute, and her claims were "not presented to the state superior court and . . . the relief she now seeks does not undermine the factual or legal conclusions the state court reached").

Crucially, however, despite finding that Defendants' declaration of death was proper under New York law, the State Court did *not* order Defendants to remove Ms. Frederick from life support, cease treating her, or take any other specific action—rather, the State Court made clear that the decision about what further actions to take with respect to Ms. Frederick was up to St. Elizabeth. (Dkt. No. 9-2, at 238-39). Therefore, Defendants' decision to remove Ms. Frederick from her ventilator and cease her treatment and care was not "produced" or "caused" by the State Court's judgment, but was "simply ratified, acquiesced in, or left unpunished by it." *Hoblock*, 422 F.3d at 88. Under the law of the Second Circuit, then, Plaintiffs' claims—which, on their face, claim that Defendants' behavior, not the State Court judgment itself, violated the

11

constitution and federal statutes—do not appear to fall within the "narrow ground occupied by *Rooker-Feldman*." *Exxon*, 544 U.S. at 284.

In any event, even assuming Plaintiffs' claims are not barred by the *Rooker-Feldman* doctrine, and that this Court has subject matter jurisdiction over all of Plaintiffs' claims, as discussed below, Plaintiffs' request for a TRO must be denied because they have not shown any likelihood of success, or even a serious question, on the merits of any of their claims.[9]

### ii. Constitutional Claims

Plaintiffs have not demonstrated a serious question on the merits of their First, Fourth and Fourteenth Amendment claims because they have failed to produce any evidence or allegations suggesting that Defendants' alleged misconduct was done under color of state law. 42 U.S.C. § 1983 provides the statutory basis for Plaintiffs' private causes of action for constitutional violations. "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014); *see also Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("In order to state a claim under § 1983, a plaintiff must allege that [s]he was injured by either a state actor or a private party acting under color of state law."); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (noting that § 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful") (internal quotations marks omitted); *Carrillos v. Incorporated Vill. of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) ("A private actor may be considered to be acting under the color of state law for purposes of Section

---

[9] Defendants also argue that abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is appropriate here given that Plaintiffs' appeal of the State Court's dismissal of their Petition is ongoing and the case involves "important state interests" regarding the application of a state determination of death statute. (Dkt. No. 9, at 14). The Court need not decide whether *Younger* abstention is appropriate in this case because, as discussed below, Plaintiffs are not entitled to a TRO even assuming it is proper for the Court to consider their claims.

1983 if she was 'a willful participant in joint activity with the State or its agents.' This potential liability under Section 1983 also applies to a private party who conspires with a state official to violate the plaintiff's constitutional rights." (quoting *Ciambriello*, 292 F.3d at 324)).

Plaintiffs' only allegation with respect to state action is that at least one Defendant, Mohawk Valley Health System, receives funding from the state and federal governments, which is used to provide healthcare to patients like Ms. Frederick. (Dkt. No. 1, at 3). However, both Defendants are private institutions, and the law in this Circuit is clear that "the mere fact that an otherwise private institution receives public funding does not make it a state actor" for purposes of constitutional claims. *Corrente v. St. Joseph's Hosp. & Health Ctr.*, 730 F. Supp. 493, 500 (N.D.N.Y. 1990); *see also Law v. Camp*, 15 F. App'x 24, 26 (2d Cir. 2001) (finding claim that private hospital violated the Fourteenth Amendment by removing life support "meritless" because the plaintiff "has failed to offer evidence sufficient to demonstrate state action"); *Kia P. v. McIntyre,* 235 F.3d 749, 756 (2d Cir. 2000) (holding private hospital is not a state actor with respect to its provision of medical care and, therefore, "[w]hatever misdeeds the Hospital defendants may have committed in providing that care—if any there were—they are not redressable under § 1983"). Because Plaintiffs put forth no additional facts suggesting that, at any point, these private institutions acted under color of state law with respect to Ms. Frederick's medical care, Plaintiffs have presented no serious question as to whether they may be able to assert successful constitutional claims against Defendants.

### iii. Rehabilitation Act Claim

Plaintiffs' Rehabilitation Act claim similarly fails to present any serious questions as to the merits. "In order to establish a violation of § 504 [of the Rehabilitation Act], a plaintiff must show (1) that he has a disability for purposes of the Rehabilitation Act, (2) that he is 'otherwise

qualified' for the benefit that has been denied, (3) that he has been 'denied the benefits' solely by reason of his disability, and (4) that the benefit is part of a 'program or activity receiving Federal financial assistance.'" *Flight v. Gloeckler*, 68 F.3d 61, 63 (2d Cir. 1995) (citations omitted); *see also C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840-41 (2d Cir. 2014). "The Rehabilitation Act, like the ADA, was never intended to apply to decisions involving the termination of life support or medical treatment." *Schiavo ex rel Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (per curiam) (citing, *inter alia*, *United States v. Univ. Hosp., State Univ. of N.Y.*, 729 F.2d 144, 156 (2d Cir. 1984)); *see also McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (holding that, in the medical treatment context, a plaintiff pleads an actionable claim under the Rehabilitation Act only "if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of'" proper medical decision-making about the patient's case).

Here, even assuming the other elements of a Rehabilitation Act claim are met, Ms. Frederick is not "otherwise qualified" within the meaning of the Rehabilitation Act for the life support, care and treatment Defendants seek to deny her, because but for her alleged disability (i.e. her coma and resulting brain death), she would not have needed or been eligible for these services in the first place. *See Schiavo*, 403 F.3d at 1294. Furthermore, the allegations in the Complaint do not suggest that Defendants' decision to withdraw treatment from Ms. Frederick was based on any improper or discriminatory factors. Rather, Defendants' decision was based on their medical determination that she is brain dead as defined in New York law, and their application of New York State's guidelines regarding the treatment of brain dead patients. Even assuming Plaintiffs are correct that Defendants' decisions were not medically sound and may even constitute malpractice, they do not constitute the type of discrimination that gives rise to a

14

Rehabilitation Act claim. *See McGugan*, 752 F.3d at 232 ("Section 504 does not authorize a claim for malpractice."). Plaintiffs have pointed to contrary no authority that would support a Rehabilitation Act claim in these circumstances. Therefore, no serious question exists as to the merits of Plaintiffs' Rehabilitation Act claim either.

### iv. ADA Claim

Finally, Plaintiffs have not presented any serious question as to the merits of their ADA claim. Plaintiffs bring their claim under Title III of the ADA, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodations by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).[10] "The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act." *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1037-38 (S.D.N.Y. 1995).

Here, as with Plaintiffs' Rehabilitation Act claim, Plaintiffs' ADA claim fails because their Complaint does not allege discrimination on the basis of disability, as contemplated by the ADA. As discussed above, based on Plaintiffs' Complaint, Defendants did not decide to withdraw life-sustaining care from Ms. Frederick because of discriminatory animus toward Ms. Frederick's disability, but because they had determined her to be brain dead pursuant to the procedures set forth in New York state law and St. Elizabeth's internal policies—a determination the State Court has already sanctioned as legally permissible. *Cf. Schiavo*, 403 F.3d at 1294

---

[10] Plaintiffs do not appear to assert a claim under Title II of the ADA, which governs discrimination by public entities, but even if they did, such a claim would fail since Plaintiffs have failed to show that either Defendant constitutes a "public entity" within the meaning of the ADA. *See Green v. City of New York*, 465 F.3d 65, 78-79 (2d Cir. 2006) (finding that a private hospital is not a "public entity" for purposes of Title II of the ADA, despite contracting with a municipality to provide services); *Schiavo*, 403 F.3d at 1293 (affirming District Court's holding that a hospice in receipt of federal funds was not a "public entity" for purposes of Title II of the ADA).

15

(finding hospice did not discriminate "on the basis of disability" by terminating a patient's life-sustaining care pursuant to a valid court order, rather than out of any discriminatory animus toward the patient). At most, Plaintiffs' Complaint alleges that Defendants' actions constitute medical malpractice in the course of Ms. Frederick's treatment. These malpractice allegations do not support an ADA claim. *See Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996) (concluding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" and that the statute "does not create a remedy for medical malpractice"); *McGugan*, 752 F.3d at 232 (relying on *Bryant*'s holding to reach a similar result in analyzing the Rehabilitation Act). As with their Rehabilitation Act claim, Plaintiffs have pointed to no contrary authority that would support an ADA claim in these circumstances. Therefore, as with their other claims, Plaintiffs' ADA claim fails to present a serious question justifying injunctive relief.

### B. Remaining Requirements for Injunctive Relief

Defendants also argue that Plaintiffs have failed to meet the irreparable harm, balancing of the equities, or public interest prongs of the standard for granting a TRO. (Dkt. No. 9, at 11, 15). The Court recognizes that, notwithstanding Defendants' argument that there can be no irreparable harm where Ms. Frederick is brain dead and has no reasonable chance of recovery, (Dkt. No. 9, at 11), the irreparable harm from denying Plaintiffs' requested TRO appears extreme and obvious. Without that TRO, Defendants will be free to withdraw the life support services keeping Ms. Frederick's body functioning, causing her body to permanently expire. At that point, Plaintiffs' death will be final and beyond all hope of being undone through subsequent decisions by this or any other Court.

As such, the Court recognizes the gravity of its decision, and sympathizes with Plaintiffs' desire to seek relief in a heartbreaking situation. However, even in these tragic circumstances, the Court is bound to act within the limits of its authority, and as such, may only grant a TRO if Plaintiffs have raised a serious, genuine question as to the merits of one or more of their claims. Because, for the reasons discussed above, Plaintiffs have not done so here, this Court is compelled to deny their request for a TRO.[11]

## V. CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiffs' motion for a TRO (Dkt. No. 2) is DENIED.

**IT IS SO ORDERED.**

Time: 2:01PM
Dated: November 5, 2020
Syracuse, New York

*Brenda K. Sannes*
Brenda K. Sannes
U.S. District Judge

---

[11] Following oral argument, after stating its intention to deny Plaintiffs' motion for a TRO, the Court indicated that it would be willing to consider granting a brief injunction in order to give Plaintiffs time to pursue an emergency appeal in the Second Circuit, upon the posting of a security bond. *See* Fed. R. Civ. P. 62(d) ("While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."); *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. Town of Bombay, NY*, 484 F. App'x. 586, 588 (2d Cir. 2012) (explaining that, while the "denial of a TRO is 'ordinarily not appealable,'" "[a] narrow exception has been established where the district court's order effectively disposes of the litigation and 'might have a serious, perhaps irreparable, consequence, [that] . . . can be effectually challenged only by immediate appeal[.]'" (alterations in original) (citations omitted)). However, Plaintiffs informed the Court that they do not intend to appeal the Court's decision.